## G. J. KIERNAN v. THE STATE.

### No. 4256. Decided November 8, 1916.

**Murder—Insanity—Argument of Counsel—Remarks by Judge.**

Where, upon trial of murder, the witnesses for the defendant testified that defendant was insane and it was dangerous to the public for him to be at large, and one of the jurors propounded questions to one of the expert physicians who had testified as to defendant's mental condition if he thought the defendant ought to be turned loose, to which he answered in the negative and that two years confinement would be insufficient, and the prosecuting officer in his argument to the jury insisted that there was no confinement for the criminally insane but the penitentiary, while the district judge remarked that he had turned someone loose because of his insanity on habeas corpus, etc., the same was reversible error. Prendergast, Presiding Judge, dissenting.

Appeal from the District Court of Bexar. Tried below before the Hon. W. S. Anderson.

Appeal from a conviction of murder; penalty, ninety-nine years imprisonment in the penitentiary.

The opinion states the case.

*S. D. Hopkins, Wm. C. Church,* and *Butler L. Knight,* for appellant.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of argument of counsel: White v. White, 183 S. W. Rep., 369; Loving v. Hazelwood, 184 id., 355; Mooney v. State, 76 Texas Crim. Rep., 539; Little v. State, 77 Texas Crim. Rep., 339, 178 S W. Rep., 326; Taylor v. State, 180 S. W. Rep., 242; Miller v. State, 79 Texas Crim. Rep., 9; Sorrell v. State, 79 Texas Crim. Rep., 437.

HARPER, JUDGE.—Appellant was convicted of murder, and his punishment assessed at ninety-nine years confinement in the State penitentiary.

The facts would show that appellant and his son John (the young man whom he killed) had an altercation at the breakfast table; that during the day appellant purchased a pistol and went to the home of his daughter and told her to warn John not to come home; that if John did come home he would kill him, showing her the pistol he had purchased, remarking, "If he came in he would come over his dead body. He also told me that morning if he came back he would kill him."

Appellant's wife testified that when he came home that evening he had a pistol in his hand, and told her if she did not want a tragedy there not to let John come home that evening. Both the mother and sister testified they gave John the warning and requested him not to come home that evening. Captain Brown of the police force testified to John coming to see him late in the afternoon, and reporting to him what his mother and sister had informed him of and desired an officer to go with him. He did not send an officer, and advised him to wait until his father had time to "cool off." That John made the remark if he could get hold of him he could take the pistol away from his father.

No one saw the tragedy but appellant. He testified that he did not say he would kill John but said instead he told his wife and daughter to tell John not to come home; that he was armed and would defend himself, he testifying to a state of facts which would lead one to believe that he thought his son was trying to put him out of the house. He then testifies that his son rushed into the room where he was, and details the fatal affray as follows: "I suppose he walked in two or three feet, and I just turned and told him: 'Hold up, hold up,' that way, 'don't advance, John.' He turned in an instant and like he was going to go back, and I felt very much relieved, in fact, happy. It was passed that way without any trouble, but I kept my eye on him all the time and he turned southwest and stopped for a minute as he went to open the door, and just in an instant that he stopped I was afraid then he was going to advance, or change his mind, and I pointed the revolver right at him. I said: 'Don't advance this way, John.' Before he did, I saw for an instant he drew himself together and says: 'Well, papa,' and he dashed at me with his right arm around my neck and we grappled into that room and into the next and into the dining room, and he sank in my arms."

In the record before us there is but one error pointed out, and as to whether or not it should cause a reversal of the case is a question regarding which our decisions are not entirely harmonious, but in the writer's opinion the best considered cases hold that under the peculiar facts of this case, the error is of that nature as to necessitate a reversal of the case.

Appellant's main defense was insanity. The testimony of Drs. Largen and Kenney would render him mentally incapable to commit

a crime in his then condition. They both had seen and examined appellant and heard the testimony on the trial. The testimony of Dr. Berrey would render him wholly sane, knowing right from wrong and legally responsible for his acts. Other testimony was introduced bearing on this issue, and it might be said the principal contested issue was whether or not appellant was sane or insane, and that bearing on this issue it appears by the record that during the examination of Dr. Kenney one juror propounded some questions: "Q. Dr. Kenney, in view of this evidence, going back for a period of seventeen years,—that time the defendant would be at the age of about thirty-eight or thirty-nine years old, he was about thirty-eight or nine when he ordered his crippled son away from home, the evidence in this case shows he has exercised uncontrollable temper with his family from time to time until the 15th of September, 1915, when he took his son's life. Now, if he has this record according to the evidence, being placed in this capacity off and on for a period of seventeen or eighteen years, I just want to ask you now, of course, I don't want the jury or anybody else to let this weigh on them at all, but I just want to ask your opinion: Now, in case a man is liberated, turned loose, what would be your opinion, don't you think he ought to be kept under cover, kept in jail, or kept in the asylum? Do you think he ought to be turned loose? A. No, sir; I do not; I don't think he ought to be turned loose. Q. Suppose he should, doctor, be sent for a period of two years, do you think you ought to turn him loose? A. No, sir."

We have copied this in the record because of the remarks of counsel complained of. In bill No. 2 it is shown that "during the argument of Mr. Joe Graham, counsel for the State, in the closing argument to the jury, stated over objection of defendant's counsel, that the State of Texas had no place for the criminally insane except the penitentiary and that if the jury in this case should acquit defendant because of his insanity he would have to be tried before another jury of six doctors and if they found him insane he would be placed in an insane asylum, and that further the law creating such board of such doctors had been declared unconstitutional and that this court had been releasing parties adjudged insane by said board; and further because the court stated, then in the presence and hearing of the jury that, 'Yes, he had just turned one loose that noon upon a writ of habeas corpus.' And because said State's counsel argued the example of Hopkins' case in this county to the jury and stated it was a case he would never forget, and that she was running at large now, and she plead insanity."

We can hardly understand the court's qualification to the bill. He verifies that the language was used by the district attorney, but says, "No request in writing at the time was made that the jury be instructed not to consider it and that in fact no exception was so reserved"; and then adds that counsel did object to the remarks and requested the court to instruct the jury not to consider the remarks, and it was at

the time counsel personally made such objection and request that the court made the remark in the presence and hearing of the jury, "Yes, he (the court) had just turned one loose (a person adjudged insane by a commission) that noon upon a writ of habeas corpus." When request was made to instruct the jury not to consider the improper remarks of the prosecuting officer, the court not only declined to do so, but in the presence and hearing of the jury emphasized the argument made by counsel that Texas had no place for the criminally insane other than the penitentiary, because the law providing the mode and means of incarcerating them in the asylum had been declared unconstitutional, and further emphasizing the only legitimate deduction from such argument that if the jury acquitted appellant on the ground of insanity and a jury commission then found him insane, and he was ordered confined in the asylum, the court would release him on habeas corpus and leave him at large, as Mrs. Hopkins was then at large.

Take such argument in the light of the question propounded by the juror to the doctor testifying to appellant's insanity, it necessarily followed that there would be conveyed to the minds of the jury that whether appellant was sane or insane, the only way he could be confined was by this jury finding him guilty and refusing to release him on the ground of insanity. Without passing on the question of whether or not Texas has a law whereby the insane can be confined in the asylums provided for their safe keeping and treatment, we will say that if appellant was in fact insane at the time he shot his son, the fact that laws of this State provided no adequate means to confine him in an asylum would not authorize his confinement in the penitentiary as a criminal. The rule of law that an insane person can not legally be held responsible for his acts is as old as the law itself—it is part and parcel of the law.

We do not know the facts surrounding the Hopkins case. We do know that such remarks were entirely outside the record in this case. It may be that counsel for the State knew that certain members of the jury were familiar with the Hopkins case, and if so this was an improper appeal to them.

We do know from this record that when Dr. Kenney was swearing to a state of facts that would render appellant irresponsible for his acts and had just answered the hypothetical question of the State, "Will you say under such state of facts he was necessarily crazy?" "I think he was, yes, sir," one of the jurors propounded questions to the doctor and asked if the doctor thought appellant ought to be turned loose, to which question the doctor answered, "No," and that two years confinement would be insufficient, and after such testimony had gone before the jury, the prosecuting officer in his argument insisted that there was no confinement for the criminally insane but the penitentiary.

It may be that after hearing all the evidence the jury was convinced that appellant was sane, and if so this judgment should stand. But who can say what weight such argument would have with the jury,

when the doctor who was testifying to appellant's insanity testified also that he should be kept confined. The assistant district attorney's argument, that if the jury found appellant insane and acquitted him on that ground, he could not be confined in the asylum, and the court "backed him up" in such statement, by stating that he had that day turned a person loose who had been adjudged insane by a commission appointed under the law, on the ground the law was unconstitutional, would make the impression on the jury that the only way to confine appellant was for them to do so by their verdict.

The jury had but little option left. The witnesses for the defendant were swearing that he was insane, and it was dangerous to the public for him to be at large; the district attorney was insisting "If you do not convict him of this murder he will be allowed to go at large," citing the Hopkins case, and this argument was reinforced by the district judge remarking, "Yes, I turned one loose today,"—as much as to say, if you acquit this man on the ground of insanity, and an effort is made to send him to the asylum under a finding of a commission that he is insane, I will turn him loose on habeas corpus. Thus it was up to the jury to find him guilty and confine him in the penitentiary, or they were then and there informed he would not be sent to an asylum, but be turned loose upon the public.

We can not sanction such improper proceeding. Appellant was entitled to have the issue of his sanity tried under the rules of law, and no improper influence brought to bear on the jury to sway their judgment on that issue.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, Presiding Judge, dissenting.